UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KAREN SCHWAB, | ) | |
| | ) | |
| Plaintiff, | ) | 12 C 8398 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| NORTHERN ILLINOIS MEDICAL CENTER d/b/a | ) | |
| CENTEGRA HOSPITAL–McHENRY, | ) | |
| | ) | |
| Defendant. | ) | |

**M**EMORANDUM **O**PINION AND **O**RDER

Karen Schwab alleges in this suit that her former employer, Northern Illinois Medical

Center d/b/a Centegra Hospital–McHenry ("Centegra"), violated the Americans with Disabilities

Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, by failing to accommodate her disability and by

terminating her after she requested a personal leave of absence. Docs. 1, 18, 44. Centegra has

moved for summary judgment. Doc. 45. The motion is denied.

**Background**

The following facts are stated as favorably to Schwab, the non-movant, as the record and

Local Rule 56.1 allow. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). In considering

Centegra's motion for summary judgment, the court must assume the truth of those facts, but it

does not vouch for them. *See Smith v. Bray*, 681 F.3d 888, 892 (7th Cir. 2012).

Centegra moved to strike Schwab's Local Rule 56.1(b)(3)(B) response and Local Rule

56.1(b)(3)(C) statement of additional facts. Doc. 56. The court denied the motion with the

caveat that it will consider only the portions of Schwab's filings that comply with Local Rule

56.1(b)(3). Doc. 58. Having reviewed Schwab's filings, the court will disregard ¶¶ 13-14, 16,

18-19, 32, 49, 51, 53, 59-63, 69, 73 of Schwab's Local Rule 56.1(b)(3)(B) response (Doc. 52) to

the extent they include facts that go beyond what is fairly responsive to the corresponding paragraphs of Centegra's Local Rule 56.1(a)(3) statement. *See Levin v. Grecian*, __ F. Supp.2d __, 2013 WL 2403642, at *1 (N.D. Ill. May 31, 2013) ("If the non-movant wants to assert facts that go beyond what is fairly responsive to the movant's factual assertion, then he must do so not in his Local Rule 56.1(b)(3)(B) response, but in his 'statement … of any additional facts that require denial of summary judgment' under Local Rule 56.1(b)(3)(C)."); *Johnson v. Cnty. of Cook*, 2012 WL 2905485, at *12 (N.D. Ill. July 16, 2012) ("It is inappropriate for a non-movant to include additional facts, meaning facts extraneous to the substance of the paragraph to which the non-movant is responding, in a Local Rule 56.1(b)(3)(B) response. Rather, Local Rule 56.1 *requires specifically* that a litigant seeking to oppose a motion for summary judgment file a response that contains a separate statement under Local Rule 56.1(b)(3)(C) of any additional facts that require the denial of summary judgment.") (citations and internal quotation marks omitted). That said, many of the non-responsive facts in Schwab's Local Rule 56.1(b)(3)(B) response also are set forth in her Local Rule 56.1(b)(3)(C) statement of additional facts (Doc. 53), and those facts will be considered.

Centegra denies almost all of Schwab's Local Rule 56.1(b)(3)(C) assertions, often objecting on the grounds that they "fail to comply with the Local Rule 56.1 requirement of concise, short numbered paragraphs" and that "the facts asserted are immaterial." Doc. 60. Although the paragraphs in Schwab's Local Rule 56.1(b)(3)(C) statement range from three and six sentences each and could have been shorter at times, the court will not disregard them for failing to be more concise. With respect to materiality, the court will ignore extraneous matter and take into account only those facts that are relevant. In addition, the court will disregard any of Schwab's assertions that present legal argument or that are not supported with specific record

citations. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008) ("[i]t is inappropriate to make legal arguments in a Rule 56.1 statement"); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004) ("[W]here a non-moving party denies a factual allegation by the party moving for summary judgment, that denial must include a specific reference to the affidavit or other part of the record that supports such a denial. Citations to an entire transcript of a deposition or to a lengthy exhibit are not specific and are accordingly, inappropriate. A court should not be expected to review a lengthy record for facts that a party could have easily identified with greater particularity."); *Rush v. MacArthur Found.*, 2014 WL 1797581, at *2 (N.D. Ill. May 6, 2014) (disregarding assertions in the plaintiff's Local Rule 56.1(b)(3)(B) response that failed to cite specific record material); *Erwin v. U.S. Dep't of State*, 2013 WL 6452758, at *1 (N.D. Ill. Dec. 9, 2013) (same); *Sys. Dev. Integration, LLC v. Computer Scis. Corp.*, 739 F. Supp. 2d 1063, 1068 (N.D. Ill. 2010) ("the purpose of Rule 56.1 statements is to identify the relevant evidence supporting the material facts, not to make factual or legal arguments, and thus the Court will not address the parties' arguments made in their Rule 56.1 statements and responses") (citation omitted).

From September 2000 to August 2010, Schwab was employed by Centegra, a hospital system based in McHenry, Illinois, as a part-time registrar in the Patient Access department. Doc. 52 at ¶ 10. Schwab worked a minimum of 45 hours every two weeks, averaging three days per week and thirteen days per month. *Id*. at ¶ 11. Schwab reported to Cheryl Ringler, the Patient Access department team leader, and to Kathy Zembal, the Patient Access department manager, who was also Ringler's supervisor. *Id*. at ¶ 12.

Centegra has several policies governing leaves of absence, all of which are available on Centegra's intranet. *Id*. at ¶¶ 13-14. Centegra established a Family and Medical Leave Act

("FMLA") policy and a Victim's Economic Security and Safety Act ("VESSA") policy for associates who need time off for family or medical issues. *Id.* at ¶ 15. Centegra also has a Medical Leave policy for associates with medical issues who do not qualify for FMLA leave or who may need additional time upon the expiration of their FMLA leave. *Id.* at ¶ 16. Centegra has as well a Personal Leave policy, under which associates may take up to thirty consecutive days off from work to manage personal issues. *Id.* at ¶ 17. The Personal Leave policy states:

A. REQUESTING LEAVE

Associates may request a leave for absences that require them to be absent from work for more than seven consecutive days. Associates should request Personal Leave 30 days prior to the beginning of the leave, if the leave is foreseeable. If the leave is unforeseeable, the Associate must request leave as soon as practical.

B. APPROVAL

The associate must contact Human Resources Development to complete and submit a Leave Determination Letter for a Personal Leave of Absence. The appropriate paperwork will then be provided to the Associate requesting the leave of absence. The Leave Request Form will also require the approval and signature by the Department Leader. The Department Leader will communicate to the Associate if the request is approved or denied. All completed forms will need to be sent to Human Resources Development for processing.

...

G. RETURN TO WORK

There is no guarantee of a position when the Associate is ready to return to work. If the Associate's job no longer exists, the Associate may post for openings that are available at the time the Associate is ready to return. If the Associate does not qualify for any openings, employment will be terminated.
…

H. EXPIRATION OF LEAVE

At the end of thirty days, Associates who have not returned to work will be terminated from their employment unless they have posted for a position for which they qualify and are waiting for a determination on the position.

Doc. 47-5 at 1-3.

Centegra's Absenteeism and Tardiness policy states: "If for any reason an Associate is unable to work, the Associate must call his/her immediate supervisor or designee as far in advance of the scheduled shift as possible, and continue to call in each subsequent day of absence unless previous arrangements have been made with the supervisor." Doc. 52 at ¶ 19; Doc. 47-6 at 2. The policy specifies that "[a]ny Associate who is scheduled to work and fails to report for an assigned work shift without notifying the appropriate supervisor may be considered to have voluntarily resigned from their position and may be terminated as of their last working day." *Ibid*.

In 2001, Schwab was diagnosed with stage two breast cancer. Doc. 52 at ¶ 22. Schwab was granted a medical leave of absence from May 2001 to December 2001 for breast cancer surgery, chemotherapy, and radiation treatment. *Id*. at ¶ 22. In 2004, after finding a lump in her breast, Schwab received FMLA leave from May 21, 2004 to July 18, 2004 for follow-up testing for a recurrence of breast cancer. *Id*. at ¶ 23. During this seven-week leave, Schwab attended a total of two medical appointments and learned that she did not have a recurrence. *Ibid*. In 2006, Schwab found another lump in her breast, and received medical leave from February 21, 2006 to March 11, 2006 to undergo follow-up testing. *Id*. at ¶ 24. Since 2001, Schwab has not had any recurrences of breast cancer or required further breast cancer surgeries or chemotherapy treatments. *Id*. at ¶ 29. Although her cancer has been in remission since 2001, Schwab must undergo follow-up testing at least once per year. Doc. 60 at ¶ 7.

In 2007, Schwab requested and received FMLA leave from May 2007 to August 2007 so that she could have a hysterectomy, which was unrelated to her breast cancer. Doc. 52 at ¶ 25. When she returned to work, Centegra accommodated Schwab's requested to work shorter, four-

hour shifts.  *Ibid*.  In 2009, Schwab's daughter suffered an instance of domestic violence, and

Schwab requested and received VESSA leave from June 1, 2009 to June 18, 2009.  *Id*. at ¶ 26.

The Total Rewards group within Centegra's Human Resources department handles all

associates' requests for leaves of absence, and handled Schwab's aforementioned FMLA,

VESSA, and medical leave requests.  *Id*. at ¶¶ 27, 55.

Ringler's role as team leader involved managing the work schedule for the Patient Access

department and finding coverage for open shifts.  Doc. 52 at ¶ 34.  Ringler was also responsible

for handling associates' requests for accrued time off, including requests for taking days off for

medical appointments; however, she did not handle requests for leaves of absence or for

permanent schedule or status changes.  *Ibid*.  On May 5, 2010, Schwab submitted a request to

Ringler for time off on July 6, 2010, July 13, 2010, August 24, 2010, and August 25, 2010.  *Id*. at

¶ 35.  At the time of her request, Schwab had not yet scheduled medical appointments for those

dates.  *Ibid*.  Ringler approved Schwab's request on May 6, 2010.  *Id*. at ¶ 36.

In the summer of 2010, the Patient Access department was short-staffed, particularly

during the shift that Schwab worked two nights per week.  *Id*. at ¶¶ 37-38.  In early July 2010,

Schwab found another lump in her breast and wanted to have it checked to make sure she did not

have a recurrence of breast cancer.  *Id*. at ¶ 39.  On July 13, 2010, Schwab made an oral request

to Ringler to change from part-time status to registry status, which would reduce her workload to

only one weekend per month.  *Id*. at ¶¶ 40, 42, 47.  Employees on registry status may work on-

call and select their shifts from a list of open shifts posted two weeks prior.  *Id*. at ¶ 41.

Schwab was interested in registry status so she could have more flexibility in her

schedule to attend medical appointments.  *Id*. at ¶ 45.  Her preferred doctor at Northwestern

typically took six months off each year for medical research and was difficult to book for

appointments. *Ibid*. Although Schwab recognized that she could have scheduled appointments with another doctor, she wanted to be available to attend appointments on short notice in the event that her doctor's other patients cancelled their appointments. *Ibid*. Schwab also wanted more flexibility to attend court dates for her daughter and to provide caregiving to her 56-year-old brother, who had cerebral palsy. *Id*. at ¶ 46.

During Schwab's conversation with Ringler regarding her request to change to registry status, Schwab mentioned that she needed flexibility to attend medical appointments related to breast cancer, but she did not tell Ringler or anyone else in the office that she had found another lump in her breast. *Id*. at ¶ 47. At the time, both Ringler and Zembal were aware that Schwab had previously been diagnosed with breast cancer and had been in remission for many years. Doc. 60 at ¶¶ 10-11. Ringler told Schwab that she would talk to Zembal to see how they could change the schedule to accommodate a change to registry status. Doc. 52 at ¶ 48. On July 15, 2010, Ringler sent Schwab an email stating in relevant part: "Kathy and I discussed your schedule and she is open to change … bear with us and let's see what the next couple week[s] bring. Some possible changes could open up the door to change your schedule." *Id*. at ¶ 49; Doc. 60 at ¶ 17. On July 22, 2010, Schwab spoke with Zembal and reiterated that she wanted to change to registry status so she could schedule medical appointments for testing related to breast cancer. Doc. 52 at ¶ 50; Doc. 60 at ¶ 48. In the meantime, no other employees received a transfer to registry status. Doc. 52 at ¶¶ 51-52.

Centegra disputes Schwab's assertion that there was an opening in registry status in July 2010 that she could have filled. Doc. 60 at ¶ 19. Zembal's deposition testimony, on which Schwab relies, states: "[W]e had so many registry people. And I think there was an opening, but I can't really be positive without looking at … my schedule from back then." Doc. 54-2 at 20-

21. Zembal proceeded to testify: "I can't be specific because I don't remember, but I think there was a registry position open." *Id*. at 28. When asked whether she "would have been able to put Karen in that registry position," Zembal responded: "After we followed the protocol. I would have to go to Vicki [Wheaton] and let Vicki know. Then I would have to take it to HR because that would change [Schwab's] status. And then they would have to do it in HR." *Ibid*. Schwab also points to her own deposition testimony that in 2010, the hospital "needed registry people really bad," as "[t]here was a high need for registry people to help fill shifts and vacations and illness." Doc. 47-1 at 11. Centegra correctly notes that the record, viewed in Schwab's favor, shows only that Zembal "could not remember if there was a registry opening in July 2010 and that it *might* have been possible to arrange the change to registry status." Doc. 60 at ¶ 19.

In July 2010, Schwab received positive feedback on her job performance. Doc. 60 at ¶ 1. On July 13, 2010, Zembal sent Schwab a hand-written note stating: "Thank you for all of your hard work and patience during this trying time [in reference to Schwab's willingness to cover shifts for the short-staffed department]. You are doing a great job." *Ibid*. The same day, Zembal sent Schwab an email congratulating her on ten years of service and thanking her "for all [her] hard work and dedication." *Id*. at ¶ 3. On July 15, 2010, Zembal sent the entire department an email stating, "WOW! GREAT JOB!!!!!!! Karen Schwab collected $10,000.00 today in the ER." *Id*. at ¶ 2. The same day, Ringler sent Karen an email stating, "Awesome Karen! Way to go!" *Ibid*. Centegra does not dispute that, "prior to August 2010, Schwab's job performance and attendance were satisfactory." *Id*. at ¶ 57.

Schwab was scheduled to work eight days in August 2010. Doc. 52 at ¶ 53. On July 27, 2010, Schwab received an email from Zembal asking her to pitch in and pick up extra shifts because the department was short-staffed. *Id*. at ¶ 57. On July 30, 2010, Schwab told the

Human Resources department that she needed to take the time off for medical testing for breast cancer, as she wanted to be available for last-minute appointments with her preferred doctor. *Id.* at ¶ 54. Bonnie Ungaro from Human Resources informed Schwab that there were no registry status positions available and that she was not eligible for FMLA leave, but that she could request a personal leave of absence. *Id.* at ¶ 55; Doc. 60 at ¶ 12. Although Schwab spoke to Ringler and Zembal prior to taking her FMLA, medical, and VESSA leaves of absence, at no time did Schwab speak to them about her request for personal leave. Doc. 52 at ¶ 59.

On August 2, 2010, Schwab filled out a two-page form provided by Human Resources requesting a personal leave of absence from August 1, 2010 to September 1, 2010. *Id.* at ¶ 56. The first page of the form had an empty line for the department leader's signature. *Id.* at ¶ 59. The second page of the form had already been filled out by Human Resources and consisted of an "X" next to the statement, "You qualify for a Personal Leave of Absence," along with the initials "NM – 8/2" next to "HRD Use Only) Date Processed & Initials." Doc. 60 at ¶ 25. "NM" matched the initials of Nick Milford, who worked in the Total Rewards team of Human Resources. *Ibid.* Schwab submitted her form to Patricia Fiorese, a receptionist in Human Resources, who then sent it to Zembal. *Id.* at ¶¶ 27, 29.

Human Resources receptionists do not have the authority to grant leaves of absence and do not verify completion of leave paperwork. Doc. 52 at ¶ 61. Schwab asserts that Fiorese told Schwab that she would pass the form to Zembal, that Schwab was "all set," and that Fiorese would "see [Schwab] in 30 days." *Id.* at ¶ 60; Doc. 60 at ¶ 27. Centegra objects to the extent that Schwab's conversation with Fiorese is used to show that Schwab was granted a leave of absence. Doc. 60 at ¶¶ 27, 30, 31; Doc. 59 at 5. "[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial." *Eisenstadt v. Centel*

*Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). Fiorese's remarks will be considered to demonstrate their effect on Schwab—namely, to support the fact that Schwab believed that her request for personal leave was approved. Centegra does not dispute for summary judgment purposes that Schwab believed that her leave of absence was approved when she handed in her paperwork and that nothing else needed to be done. Doc. 60 at ¶¶ 27, 30; Doc. 59 at 5. There is no need to resolve at this juncture whether Fiorese's remarks are admissible to show that Schwab actually had been granted a leave of absence, as summary judgment is being denied even without considering Fiorese's remarks for that purpose.

Schwab and Centegra dispute whether Zembal's approval was required for Schwab's personal leave to go into effect. Schwab did not believe that she needed such approval, and she expected that Human Resources would have told her of that requirement when they "went down a checklist of the different things that were particular to [her] personal leave of absence." Doc. 60 at ¶ 31. Schwab cites to the following portion of Zembal's deposition testimony to support her view that Zembal lacked the authority to approve or deny her leave of absence:

> Q:  And what's the procedure if [Schwab] was on an approved leave of absence? What do you do then?
> A:  I don't do anything.
> Q:  Okay. You just sign the form and return it to HR?
> A:  Yes.
> Q:  And so you're saying then that you did approve Karen's leave of absence?
> A:  It's not up to me to approve or deny. It's not in my hands to do the approving. This just lets her know, lets HR know that she notified me. I can't approve it or deny it in any way. That's for HR to do.
> Q:  So you're just signing the form, basically as an acknowledgement that … you received the request?
> A:  Yes.
> Q:  Okay. So to your knowledge then, Karen took and was granted a personal leave of absence beginning August 2?
> A:  As far as I know, yes.
> Q:  And you had no authority to deny that request?
> A:  No.

*Id.* at ¶¶ 33-34; Doc. 54-2 at 42-43.  However, Centegra points to the plain language of its Personal Leave policy, which states that "[t]he Leave Request Form will also require the approval and signature by the Department Leader," who "will communicate to the Associate if the request is approved or denied."  Doc. 60 at ¶ 34; Doc. 47-5 at 1.  Centegra also notes that the Leave Request Form explicitly requires the department leader's signature.  Doc. 60 at ¶ 34; Doc. 47-11.  Even though the official policy required Zembal's approval, a reasonable factfinder could conclude that this was a mere formality and that Centegra, through the Human Resources department, granted Schwab's leave of absence.

While Schwab was at the Human Resources office, Zembal called Schwab and left her a message asking if she could pick up an extra shift that Zembal and Ringler had difficulty filling.  Doc. 52 at ¶ 58.  At the time Schwab handed in her paperwork, she was scheduled to work on August 3, 2010, and August 4, 2010.  *Id.* at ¶ 62.  Acting under the belief that her personal leave request was approved, Schwab did not report to work on those dates.  *Id.* at ¶ 63.

On August 3, 2010, Zembal called Schwab's home phone and left multiple voicemails between 11 a.m. and 3 p.m., while Schwab was out running errands.  *Id.* at ¶ 64.  Schwab checked her caller I.D. on either August 3 or August 4 and saw that she had several missed calls from Centegra, but she did not check her voicemail or return the calls at that time.  *Id.* at ¶ 66.  On August 4, 2010, Schwab spoke to Jennifer Endicott, a Centegra employee, who informed her that Zembal had told Endicott that Schwab was on a leave of absence at the time.  Doc. 60 at ¶ 45.  Centegra objects to this statement on hearsay grounds to the extent it is introduced to show that Schwab actually was on an approved leave of absence.  *Ibid.*  However, Centegra does not dispute that Schwab's conversation with Endicott is admissible to show that Schwab believed that she was on an approved personal leave of absence.  *Ibid.*  Again, there is no need to resolve

at this juncture whether Endicott's statement is admissible to show that Schwab actually had been granted a leave of absence, as summary judgment is being denied even without considering the statement for that purpose.

A few days later, Schwab listened to two voicemails that Zembal had left on August 3, 2010. Doc. 52 at ¶ 67. In the first message, Zembal said, "Karen, can you give me a call? We need to talk about the schedule." *Ibid*. In the second message, Zembal told Schwab that she was considered a "no-call – no-show" and that Centegra was accepting Schwab's voluntary resignation. *Ibid*. On August 9, 2010, Schwab received a termination letter signed by Zembal, which was dated August 5, 2010. *Id*. at ¶ 68. The termination letter stated:

> This letter is to confirm your voluntary resignation from Centegra Health System effective August 5, 2010 based on the following list.
>
> - On Tuesday [August 3, 2010] I received a form from you by interoffice requesting a personal leave immediately without prior notification from you in person.
> - I called your home to inform you that I was not able to approve this request due to extreme circumstances with scheduling at 10:48am.
> - I left a message asking you to call me so we could work out a solution.
> - I had not heard from you by 11:05am so I called and left another message for you letting you know that I needed to hear from you immediately because you were on the schedule for the overnight shift Tuesday and Wednesday night.
> - I again had not heard from you by 11:25am so I called your home again and left another message letting you know that I expected you to call me and fill your scheduled shift.
> - I had not heard from you by 12:00 noon so I left another message for you requesting another call.
> - I had not heard from you by 3:00pm so I left another message for you requesting another call.
> - I had not heard from you by 6:00pm so I left another message for you requesting another call and letting you know that if I did not hear from you and you did not show up for your scheduled shift that I would consider that your voluntary resignation.
> - In total I left you 6 messages so we could talk and you choose to ignore my requests to call me.

- Lastly you were a "no-call – no show" for your assigned 8/3/10 and 8/4/10 11p-7a shifts.
- Centegra policy HR-2.00 Absenteeism and Tardiness section D states that "Any associate[] who is scheduled to work and fails to report for an assigned work shift without notifying the appropriate supervisor may be considered to have voluntarily resigned from their position and may be terminated as of their last working day."
- Based on this policy and the fact that you did not notify me your supervisor or return any of my calls I am accepting your voluntary resignation effective immediately.

*Id*. at ¶ 69; Doc. 47-13 at 1-2.

Copies of Centegra's Fair Treatment policy and Absenteeism and Tardiness policy were attached to the letter. Doc. 52 at ¶ 70. After receiving the letter, Schwab checked her voicemail and found another message Zembal had left on August 3, in which Zembal told Schwab that she needed to come in for her shift and return Zembal's call right away. *Id*. at ¶ 71. Schwab did not return Zembal's calls or contact Human Resources to discuss the termination letter, and she proceeded to file a charge with the EEOC alleging discrimination on the bases of race, age, and disability, as well as retaliation. *Id*. at ¶ 74.

Schwab maintains that even though the termination letter purported to terminate Schwab for being a "no-call – no show," Zembal actually believed that Schwab was on an approved personal leave of absence for the month of August and thus would have no reason to expect Schwab to appear for her August 3 or 4 shifts. Doc. 60 at ¶ 33. Zembal testified at her deposition that when she received Schwab's paperwork from Human Resources on August 2, 2010, she understood that Schwab had requested a personal leave of absence and that she had "no reason to deny that … personal leave of absence request." *Ibid*.; Doc 54-2 at 39. Zembal added that it was her "understanding then that as of August 2, [Schwab] was on a personal leave of absence." Doc. 60 at ¶ 33; Doc. 54-2 at 40, 43. Zembal further testified that Anne Haslinger from Human Resources told her that Schwab was on an approved leave of absence. Doc. 60 at

¶ 35; Doc. 54-2 at 63.  Centegra argues that Zembal's testimony regarding what Haslinger told her is inadmissible hearsay and cannot be introduced for the proposition that Schwab was in fact on an approved leave of absence.  Doc. 60 at ¶ 35; Doc. 59 at 6.  Once again, there is no need to resolve that objection at this juncture, and Zembal's testimony about what Haslinger told her will be considered only to the extent it goes to Zembal's belief that Schwab was on an approved leave of absence.

Centegra disputes that Zembal believed that Schwab was on an approved leave of absence, citing to Zembal's deposition testimony that the termination letter and her notes refreshed her recollection and that she did not believe that Schwab was on a personal leave of absence:

> Q:   And you testified earlier today that Karen had taken a 30-day personal leave prior to her termination.  Is that what you testified earlier?
> A:   I said that's what this [termination] letter stated it was for. … A 30-day personal leave.
> Q:   Okay.  But after seeing the termination letter and your notes … does that refresh your recollection about whether Karen was on a 30-day leave of absence?
> A:   Yes.
> Q:   Okay.  And was Karen on a 30-day personal leave?
> A:   No.  Not to my knowledge, no.

Doc. 60 at ¶ 33; Doc. 60-1 at 8-9.

Schwab, however, points to Zembal's testimony that her sole reason for terminating Schwab was because Zembal did not know when Schwab was returning from her personal leave and did not call Zembal back to inform her of her return date.  Doc. 60 at ¶¶ 54-55.  Upon receiving confirmation from Human Resources that Schwab was going on personal leave, Zembal asked if "they could just let [her] know when [Schwab] was coming back."  *Id*. at ¶¶ 40, 54-55.  Zembal testified in relevant part:

Q:  All right.  So I want to understand exactly what you're saying here is you did not know when Karen was going to return from her leave of absence, correct?

A:  Correct.

Q:  And that's the sole reason that you contacted Anne [Haslinger] regarding this issue?

A:  Yes.

Q:  And that's the sole reason that you called Karen?

A:  Yes.

Q:  And Karen did not call you back, correct?

A:  No.  Correct.

Q:  And that's the reason why she was terminated?

A:  Yes.

Q:  Because she did not call you back, and you did not know when she was returning from her leave of absence?

A:  I was instructed by Anne to go ahead and write up the termination letter.

Doc. 54-2 at 61-62.  Centegra argues that this testimony is speculative and contradicts the

termination letter, and also that Zembal subsequently corrected her statements after her memory

was refreshed by that letter.  Doc. 60 at ¶ 55.  Specifically, Zembal later testified:

Q:  Okay.  Does this [termination] letter refresh your recollection about the reason for Karen's termination?

A:  Yes.

…

Q:  Okay.  And I think you testified before that … you were calling Karen to see when she was returning from leave?

A:  Correct.

Q:  Okay.  But as counsel asked you, this letter doesn't say anything about asking or calling Karen to ask that question, correct?

A:  Correct.

Q:  Okay.  But did you call Karen?

A:  I did.

Q:  Okay.  And what was the purpose of the call?

…

A:  To let[] her know that I did receive the form, and that I needed to understand what she was requesting, applying for.

Doc. 60-1 at 6-7.

Schwab also asserts that Zembal believed that Schwab was on a leave of absence because Zembal took Schwab off the schedule for August 3 and 4 after receiving the leave request paperwork from Human Resources. Doc. 60 at ¶¶ 35-36. Zembal testified at her deposition in relevant part:

> Q: So likely, if [the Leave Request form] was sent out on August 2, you would have received it August 3 in the morning sometime?
> A: Possibly, yes.
> Q: Okay. And so after you talked to HR, what was your understanding of what you should do with respect to the form?
> A: Take her off the schedule.
> Q: Okay. And should you have signed the form then?
> A: [Human Resources] didn't ask me to sign anything and send it back. They just said [to] take [Schwab] off the schedule, so that's what we did.
> Q: Okay. You took her off the schedule then at the time?
> A: Yes.
> Q: There was no problem that she—with her schedule shift during that time? You would have found coverage for them?
> A: We would have had to find coverage for them, yes.
> Q: Okay. Even if she was scheduled to work that night?
> A: Yes. We would have had to.
>
> …
>
> Q: Would it have been a problem with approving the leave of absence if she was scheduled to work that same day?
> A: I had no choice.
>
> …
>
> Q: And you took her off of the schedule then at that point in time?
> A: I had Cheryl take her off, yes.

Doc. 54-2 at 44-46, 72. Centegra denies that Zembal took Schwab off the schedule, citing to Schwab's deposition testimony that "I was scheduled to work August 3 and 4." Doc. 60 at ¶ 36; Doc. 47-1 at 73. However, Centegra fails to acknowledge the context for this statement, as Schwab was explaining that Zembal had called her on August 2 to ask "if [Schwab] could work another shift in between [her then-assigned August 3 and August 4 shifts] for Lewanda." Doc.

47-1 at 73. Zembal testified that she took Schwab off the schedule on August 3, so it is not inconsistent for Schwab to state that as of August 2, she was still scheduled to work on August 3 and 4. Centegra also argues that "Zembal's testimony was speculative and blatantly contradicts both the record and Schwab's own version of events; and Zembal later corrected her testimony after being shown relevant documents which refreshed her recollection," citing in relevant part to the following portion of Zembal's deposition testimony:

> Q: And you … testified that you were told Karen was on a leave of absence. Is that what you said previously?
> A: I don't remember what I said.
> Q: Okay. Well, if that's what you had said, that conflicts with this [termination] letter, correct?
> A: Correct.
> Q: Okay. Does this letter refresh your recollection about the reason or Karen's termination?
> A: Yes.
>
> …
>
> Q: So did Anne Haslinger tell you that the leave had been approved?
> A: No one told me that there was ever an approval of a leave.
> Q: Okay.

Doc. 60 at ¶ 36; Doc. 60-1 at 6-7. A reasonable factfinder could discredit this testimony and conclude from Zembal's earlier testimony that she understood from Human Resources that Schwab had been granted a personal leave of absence and thus that she removed Schwab from the August schedule.

## Discussion

"The ADA proscribes an employer from 'discriminat[ing] against a qualified individual on the basis of disability' in job application procedures and in the hiring or advancement of employees." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 533 (7th Cir. 2013) (quoting 42 U.S.C. § 12112(a)). Schwab alleges that Centegra violated the ADA by: (1) denying her two

accommodations—her request to change to registry status, and her request for personal leave; (2) discharging her in retaliation for requesting those accommodations; and (3) discriminating against her because of her disability. Doc. 1 at ¶ 25 ("Defendant discharged and retaliated against Mrs. Schwab because she asked for an accommodation."), ¶ 28 ("Defendant violated the ADA when it failed to accommodate Mrs. Schwab and discharged her."), ¶ 31 ("The discriminatory and retaliatory employment acts and policies, practices, and customs of Defendant violated the rights guaranteed by the ADA."), ¶ 32 ("Mrs. Schwab was unlawfully denied an accommodation, discharged, and retaliated against in violation of the ADA."); Doc. 10 at 2 (joint initial status report) ("The Plaintiff is seeking injunctive relief and damages to redress what she describes as discriminatory and retaliatory employment practices by the Defendant."). The court will address each claim in turn.

## I.     Failure to Accommodate

Schwab argues that Centegra failed to provide her a reasonable accommodation when it denied her requests for registry status and a month-long personal leave of absence. "The ADA requires employers to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer].'" *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1176 (7th Cir. 2013) (quoting 42 U.S.C. § 12112(b)(5)(A)). To succeed on a failure-to-accommodate claim, "(1) the plaintiff must be a qualified individual with a disability; (2) the employer must be aware of the plaintiff's disability; and (3) the employer must have failed to reasonably accommodate the disability." *Brumfield v. City of Chicago*, 735 F.3d 619, 631 (7th Cir. 2013). Centegra focuses on the third element, arguing that Schwab cannot establish that

Centegra failed to reasonably accommodate her alleged disability, because "it was not reasonable for Schwab to request an entire month off, whether on registry status or on a personal leave of absence, in order to make herself available for last-minute cancellation appointments with her preferred physician."  Doc. 46 at 13-14.

Under the ADA, a "reasonable accommodation" may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position …, and other similar accommodations for individuals with disabilities."  42 U.S.C. § 12111(9)(B).  "The facts relevant to a determination of whether a medical leave is a reasonable accommodation are the facts available to the decision-maker at the time of the employment decision."  *Amadio v. Ford Motor Co.*, 238 F.3d 919, 928 (7th Cir. 2001).  An accommodation need not be made, however, if it "would impose an undue hardship" on the operation of the employer's business.  42 U.S.C. § 12112(b)(5)(A).  "The defendant has the burden to prove that the accommodation would create an undue hardship on the business, but the plaintiff must first show that the accommodation [she] seeks is reasonable on its face."  *Majors*, 714 F.3d at 535 (internal quotation marks omitted).

Taking the facts in the light most favorable to Schwab, a reasonable jury could find that a change to registry status or, in the alternative, a one-month leave of absence were on their face reasonable accommodations that would have allowed Schwab to be available for last-minute medical appointments related to testing for breast cancer.  Zembal and Ringler knew at the time of Schwab's requests that Schwab was previously treated for breast cancer and they had approved her prior requests for FMLA and medical leaves spanning from three to seven weeks in 2004 and 2006 to undergo testing related to breast cancer.  Moreover, Ringler had approved Schwab's request for time off for two shifts in July 2010 and two shifts in August 2010 so that she could be available for medical appointments, even though Schwab had not yet scheduled

them at the time of her request.  The burden thus shifts to Centegra to show that granting registry status or the leave of absence would have constituted an undue hardship.

With respect to the registry status request, the record indicates that Human Resources' reason for denying the request was that there were no vacancies at the time.  "An employer may be obligated to reassign a disabled employee, but only to vacant positions; an employer is not required to 'bump' other employees to create a vacancy so as to be able to reassign the disabled employee. … Nor is an employer obligated to create a 'new' position for the disabled employee."  *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996).  Schwab argues that there was in fact a registry status vacancy, citing Zembal's testimony that she thought there was a vacancy at the time but that she could not remember.  There is no need to determine whether Schwab is right, for even assuming that no reasonable jury could find that there was such a vacancy, Centegra would still have been obligated to offer an "alternative reasonable accommodation" so long as it did not impose an undue hardship.  *Ibid.*; *see McCreary v. Libbey-Owens-Ford Co.*, 132 F.3d 1159, 1165 (7th Cir. 1997) ("An employer need only provide a reasonable accommodation, not necessarily the accommodation the employee requests.").

The approval of Schwab's personal leave request was such an alternative reasonable accommodation.  When Human Resources denied Schwab's registry status request, it informed her that she was eligible to request a personal leave of absence.  There are issues of fact as to whether granting this request would have imposed an undue hardship on Centegra.  At the time Schwab requested a month of personal leave in August 2010, it is undisputed that the Patient Access department was short-staffed, particularly during the overnight shift that Schwab worked.  Schwab was aware of this, as Zembal had asked her in July and August 2010 to pick up extra shifts.  While being short-staffed could certainly justify denial of Schwab's personal leave

request, there is evidence in the record from which a reasonable jury could conclude that staff constraints were not a consideration in the decision and that Human Resources had initially approved the request, only to revoke it upon Schwab's termination.

Schwab argues that passages from Zembal's deposition testimony suggest that Human Resources had granted Schwab's personal leave request even though her department was short-staffed. For example, Zembal testified that after she received Schwab's personal leave paperwork and "talked to HR" on the morning of August 3, 2010, her understanding was that she should take Schwab off the schedule. Doc. 54-2 at 44. When asked whether it would have been "a problem with approving the leave of absence if [Schwab] was scheduled to work that same day," Zembal responded that she "had no choice" and "would have had to find coverage for [Schwab's scheduled shifts]," and proceeded to ask Ringler to take Schwab off the schedule "at that point in time." *Id*. at 45-46, 72. Zembal also testified that when she was told by Human Resources that Schwab was on personal leave, she did not challenge the decision and asked only if "they could just let [her] know when [Schwab] was coming back." Doc. 60 at ¶¶ 40, 54-55. Zembal later revised her testimony upon having her memory refreshed by her notes and the termination letter, stating that "[n]o one told [her] that there was ever an approval of a leave" and that she did not believe Schwab was on an approved leave of absence. Doc. 60-1 at 6-9.

It is up to the factfinder to determine which part of Zembal's testimony is accurate and what inferences to draw from it. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder"). A reasonable jury could determine that Centegra initially approved Schwab's personal leave request on August 3 but failed to deliver on this reasonable accommodation when it revoked its approval two days later on the unfounded

ground that Schwab was a "no-call – no-show." The jury could then conclude that granting the personal leave request, both as a stand-alone accommodation and an alternative reasonable accommodation to the registry status request, was not an undue burden to Centegra and find in Schwab's favor.

## II.     Retaliation

Centegra's opening brief does not address Schwab's retaliation claim—in fact, it does not even utter the words "retaliate" or "retaliation." Doc. 46. Accordingly, Centegra forfeited for summary judgment purposes any argument that a reasonable jury could not find for Schwab on her retaliation claim. *See Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) ("As the moving party, the [defendant] had the initial burden of identifying the basis for seeking summary judgment."); *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006) ("As a general matter, if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."); *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 979 (7th Cir. 1996) ("Only after the movant has articulated with references to the record and to the law specific reasons why it believes there is no genuine issue of material fact must the nonmovant present evidence sufficient to demonstrate an issue for trial."); *Titran v. Ackman*, 893 F.2d 145, 148 (7th Cir. 1990) ("[w]hen a party moves for summary judgment on ground A, the opposing party need not address grounds B, C, and so on"). Although Centegra addresses the retaliation claim in its reply brief, Doc. 59 at 14-15, that was too late, as arguments presented for the first time in a reply brief are forfeited. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("the district court is entitled to find that an argument raised for the first time in a reply brief is forfeited"); *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 389

(7th Cir. 2003) ("Because Volvo raised the applicability of the Maine statute in its reply brief, the district court was entitled to find that Volvo waived the issue."); *Starks v. City of Waukegan*, 946 F. Supp. 2d 780, 788 (N.D. Ill. 2013).

## III. Discrimination

"There are two ways of proving a discrimination claim under the ADA: the 'direct' method and the 'indirect method.'" *Cloe*, 712 F.3d at 1182. Because Schwab satisfies the direct method, there is no need to consider the indirect method.

"Under the direct method, a plaintiff can present either direct or circumstantial evidence to meet its burden. Direct evidence requires an admission by the decision maker that his or her actions were based upon the prohibited animus." *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011) (citations omitted). There is no direct evidence of discrimination in this case. "However, employers are usually careful not to offer overt remarks revealing discrimination, and circumstantial evidence that allows a jury to infer intentional discrimination is also permissible. The type of circumstantial evidence that a plaintiff may produce to survive summary judgment includes: (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Ibid*. (citations omitted). "By itself, temporal proximity would not normally create an issue of material fact as to causation … although it could suffice where the adverse action followed on the heels of the employer's discovery of the employee's disability." *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 506-07 (7th Cir. 2004). A "plaintiff may show pretext by presenting evidence tending to prove that the employer's proffered reasons are

factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge." *Nawrot v. CPC Int'l*, 277 F.3d 896, 906 (7th Cir. 2002) (internal quotation marks omitted).

A reasonable jury could conclude from the record that Schwab was the victim of discrimination. The undisputed series of events leading up to Schwab's August 5, 2010 termination is as follows. (1) On May 6, 2010, Ringler approved Schwab's request for four shifts off (July 6, July 13, August 24, and August 25) for medical appointments. (2) On July 13, 2010, Schwab asked Ringler if she could change to registry status so that she could have more flexibility to attend last-minute medical appointments for testing related to breast cancer. (3) On July 15, 2010, Ringler informed Schwab that Ringler and Zembal were open to the request and asked Schwab to "bear with us and let's see what the next couple week[s] bring." Doc. 52 at ¶ 49. (4) On July 30, 2010, Schwab told Human Resources she needed time off for testing related to breast cancer, to which Human Resources responded that there were no registry status positions available but that she was eligible to request a personal leave of absence. (5) On August 2, 2010, without consulting with Ringler or Zembal, Schwab filled out paperwork requesting a personal leave for the entire month of August, in which she had been scheduled to work eight days. (6) Schwab believed her request was approved and did not report to work on her previously scheduled dates of August 3 and 4. (7) On August 3, 2010, Zembal received Schwab's personal leave paperwork from Human Resources. (8) That same day, Zembal called Schwab multiple times and left several voicemails asking Schwab to call her back. (9) Schwab did not call Zembal back, and was terminated effective August 5 for the stated reason that she was a "no-call – no show." The evidence would allow a reasonable jury to find that Schwab had

been a satisfactory employee and had no problems with job performance or attendance prior to the alleged absences in August 2010.

As discussed above, there are issues of fact as to whether Zembal believed Schwab was on an approved leave of absence. Zembal initially testified at her deposition that she understood when she received Schwab's paperwork that Schwab was granted a personal leave of absence, and that she then took Schwab off the schedule for August pursuant to Human Resources' orders. Yet, after being shown the termination letter, Zembal switched gears and testified that she had never been told by Human Resources that Schwab was on an approved leave of absence, and nor did assume that this was the case. A reasonably jury could find Zembal's later testimony not credible and could conclude that on August 3, 2010, Zembal learned that Schwab was on an approved leave of absence and took Schwab off the schedule for August. The termination that followed just two days later is temporally proximate enough to raise the inference that Zembal fired Schwab for discriminatory reasons and not because Schwab uncharacteristically failed to show up for work.

Building on this inference, a reasonable jury could find that Centegra's stated reason for terminating Schwab (that she was a "no-call – no show" on August 3 and August 4) was mere pretext. Centegra insists that "Schwab's termination was entirely consistent with Centegra's Absenteeism and Tardiness policy," but this statement is premised on the disputed assumption that Schwab did not have a valid reason for missing work. Doc. 59 at 10. A reasonable jury could conclude, upon evaluating Zembal's credibility, that Centegra's stated reason for Schwab's termination was factually baseless because Zembal understood the morning of August 3 that Schwab was on an approved leave of absence for the month of August and was no longer expected to show up for her assigned shifts, including those scheduled for August 3 and 4. It

follows that Schwab survives summary judgment on her discrimination claim under the direct method.

<strong>Conclusion</strong>

For the foregoing reasons, Centegra's summary judgment motion is denied. Schwab's ADA claims shall proceed to trial.

May 20, 2014

_____
United States District Judge